UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAMON HOUSTON,

Plaintiff,

v.

UNKNOWN SICES et al.,

Defendants.

Case No. 1:21-cv-947

Honorable Sally J. Berens

**OPINION**

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Plaintiff paid the full requisite filing fee on December 6, 2021. Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, Plaintiff consented to proceed in all matters in this action under the jurisdiction of a United States magistrate judge. (ECF No. 4.) Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendant Yahus. The Court will also dismiss, for failure to state a claim, the following claims: (1) Plaintiff's First Amendment retaliation claim against Defendant Simon; (2) Plaintiff's First Amendment claim regarding the processing of

grievances and placement on modified grievance status against Defendant Simon; and Plaintiff's Fourteenth Amendment due process claim concerning the deprivation of his property. The following claims remain in the case: (1) Plaintiff's First Amendment retaliation claims against Defendants Sices, Burlette, and Huyge; (2) his First Amendment mail claim against Defendant Simon; and (3) his Eighth Amendment claims against Defendants Sices, Burlette, Furgerson, and Salinas.

## Discussion

### I. Factual Allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Ionia Correctional Facility (ICF) in Ionia, Ionia County, Michigan. The events about which he complains occurred at that facility. Plaintiff sues Dr. Unknown Sices, Medical Assistant Unknown Huyge, Registered Nurse Unknown Burlette, Prison Counselor Unknown Simon, Grievance Coordinator Unknown Yahus, Lieutenant Unknown Salinas, and Correctional Officer Unknown Furgerson.

Plaintiff alleges that in September of 2019, while incarcerated at Bellamy Creek Correctional Facility in Ionia, Michigan, he was placed on weekly checks regarding his high blood pressure issues. (ECF No. 1, PageID.3.) During these checks, medical staff noted that Plaintiff's family had a history of kidney failure, resulting in issues with high blood pressure. (*Id.*)

Plaintiff avers that from 2019 through 2021, he had "consistent high blood pressure levels" but was never treated for that or evaluated to determine the cause. (*Id.*) In 2021, Plaintiff submitted a healthcare kite for chest pains. (*Id.*) He was called to medical for a check and was found to still have high blood pressure. (*Id.*, PageID.3–4.) Medical decided to draw blood to determine the cause. (*Id.*, PageID.4.) Two days later, Plaintiff was called to medical and told he was suffering from kidney failure. (*Id.*) He was rushed to the hospital, where he stayed for one

week. (*Id.*) Plaintiff was told that his kidney was "working at 15% and this was the cause of the high blood pressure." (*Id.*) Plaintiff told the doctor that he had been experiencing high blood pressure for a year and a half; the hospital doctor told him that facility medical personnel waited too long to draw blood samples and that he would need a transplant. (*Id.*)

Plaintiff alleges that instead of being sent to a medical facility, he was sent to Cotton Correctional Facility and then transferred to ICF on June 11, 2021. (*Id.*) He "immediately made ICF aware of all medical issues." (*Id.*) From June 1–29, 2021, Plaintiff complained about the water, explaining that it was "hurting his kidneys." (*Id.*, PageID.5.) Plaintiff noted that he was experiencing pains and that they started after he began consuming water from the faucet. (*Id.*) He told Nurse Moody (not a party) that he could not take his medications without water that was drinkable, and she responded, "I don't care if you don't take them[,] you'll be dead soon anyway with that bad kidney!" (*Id.*)

Plaintiff was sent to McLaren Hospital for surgery on June 29, 2021. (*Id.*) He was released while still "sedated from anesthetics and pain medications." (*Id.*) When he returned to ICF, he had to "be wheelchaired to the unit then literally carried to cell 36 inside unit one." (*Id.*) Plaintiff avers that because he was still under the influence of anesthetics and pain medication, he could not use the bathroom on his own, eat, or help himself. (*Id.*) He claims that staff recommended that he be placed in an observation cell until he could function properly, and Defendant Burlette stated, "He's a monkey he'll be okay in a regular cell." (*Id.*)

Plaintiff was placed in bed by unknown staff members, and his meals were passed out by an unknown staff member. (*Id.*, PageID.6.) Plaintiff mumbled that he was unable to get up, and the staff member opened the cell door slot and yelled "eat it off the floor monkey boy" after tossing

Plaintiff's food onto the floor. (*Id.*) Plaintiff had to crawl to eat and passed out from exhaustion. (*Id.*) He "awaken[ed] to having to urinate." (*Id.*)

Plaintiff attempted to get up while still heavily sedated and "fell and hit his head on the wall and was knocked unconscious." (*Id.*) He was "sprawled out on the floor nearest the toilet" for two hours. (*Id.*) He avers that other inmates on the unit "repeatedly kicked and banged for help," but that the corrections officers making rounds said that Plaintiff "was playing." (*Id.*)

After two hours, the corrections officer called Defendants Salinas and Burlette. (*Id.*) Plaintiff awoke to a riot shield in his face; he was told to get up. (*Id.*) Plaintiff explained that his head hurt and that he could not feel his limbs. (*Id.*) Defendant Salinas and another correctional officer placed Plaintiff back on the bed. (*Id.*) Defendant Burlette arrived and discovered that Plaintiff had severe swelling on the back of his head. (*Id.*) Defendant Salinas asked if Plaintiff should be placed in an observation cell; Defendant Burlette responded, "If we move him to an observation cell and this swelling is put on camera or documented we'll for sure be sued." (*Id.*, PageID.7.) Defendant Salinas decided that Plaintiff would be kept where he was. (*Id.*)

On July 1, 2021, Plaintiff submitted a grievance about the treatment he received. (*Id.*) On July 8, 2021, Plaintiff was returning to his cell from a weekly healthcare check when he saw Defendant Huyge walk away from his cell with various items. (*Id.*) Plaintiff subsequently saw that his cell had been overturned and searched. (*Id.*) Plaintiff found that numerous items, including pictures of deceased family members and cards and letters, had been taken. (*Id.*) A correctional officer told Plaintiff that Defendant Huyge had been in the cell and had taken the property. (*Id.*)

Plaintiff subsequently asked Defendant Burlette why Defendant Huyge had taken his property. (*Id.*, PageID.8.) She responded, "Because the grievance you put in, you play with fire you get burnt." (*Id.*) Defendant Burlette told Plaintiff he would get his property back if he

"sign[ed] off" on the grievance. (*Id.*) According to Plaintiff, from the time his property was stolen until July 21, 2021, Defendant Burlette continuously threatened that he would not receive his property or dialysis treatments unless he signed off on the grievance. (*Id.*)

On July 21, 2021, Defendant Furgerson chained and shackled Plaintiff and escorted him from segregation to the medical department. (*Id.*) Defendant Furgerson asked Plaintiff about the grievance he had submitted about Defendant Burlette; Plaintiff did not respond. (*Id.*) Once they arrived at medical, Defendant Furgerson told Plaintiff that he was "going off site to a[] doctor's appointment regarding his kidney failure." (*Id.*) Defendant Furgerson strip searched Plaintiff and told him that he could not wear a wave cap off site. (*Id.*) Plaintiff told him that he could throw it out, and Defendant Furgerson told Plaintiff no, and that he was refusing him the appointment. (*Id.*) When the transport officers arrived, Defendant Furgerson lied and told them that Plaintiff had refused his appointment. (*Id.*)

Two days later, Plaintiff "was rushed to the hospital for severe chest and abdominal pains, blood in his urine, vomit[,] and bowel movements." (*Id.*, PageID.9.) The doctor there asked Plaintiff about the liquids he had been consuming; Plaintiff responded that he had been drinking only water. (*Id.*) The doctor asked if there was something wrong with the water; Plaintiff told him that the water "had high levels of rust[,] but [that he had been] told by nurses it was okay to drink." (*Id.*) The doctor told Plaintiff that intake of water with high rust levels could affect his kidney and that his symptoms could be caused by the water. (*Id.*) The doctor agreed to "forward a referral to the facility doctor that the facility might not be a positive fit for [Plaintiff] due to his kidney failure." (*Id.*)

Once he returned to ICF, Plaintiff received a kite response from Registered Nurse Mary Kay McQuarrie (not a party), informing him that rust had been found in the water. (*Id.*) Days

later, Plaintiff saw Defendant Sices for dietary issues. (*Id.*) Plaintiff asked why he was not being transferred to a facility that could accommodate his health issues, noting that he needed his dialysis. (*Id.*, PageID.9–10.) Defendant Sices responded that he would have referred Plaintiff for transfer had he not submitted a grievance regarding Defendant Burlette. (*Id.*, PageID.10.) He told Plaintiff that he would not refer him until he signed off on the grievance. (*Id.*) Plaintiff asked why Defendants Burlette and Salinas tried to cover up the incident that occurred when Plaintiff returned from the hospital after surgery; Defendant Sices responded that "it was covered up to prevent any lawsuits." (*Id.*)

Between July 1 and July 21, 2021, Plaintiff submitted multiple grievances. On July 21, 2021, he wrote his last grievance and submitted it to Defendant Simon. (*Id.*) Defendant Simon stated, "Yea today is the last day you'll be filing these types of grievances." (*Id.*) When Plaintiff asked what he meant, Defendant Simon told Plaintiff to tear up the grievance, or he would have Plaintiff placed on modified grievance status. (*Id.*) Plaintiff asked what modified grievance status was, and Defendant Simon told him that he would not be able to file grievances. (*Id.*) Plaintiff told Defendant Simone that he was retaliating against him, and Defendant Simon told Plaintiff that he could do what he wanted. (*Id.*)

Days later, Defendant Yahus gave Plaintiff a notice stating that he would be placed on modified grievance status. (*Id.*, PageID.11.) When Plaintiff asked why, Defendant Yahus stated, "So you can't file no more grievances on our staff and coworkers. They should have never taught you n****** to read and write." (*Id.*) Plaintiff avers that from July 21, 2021, Defendant Simon refused to process or file any of his grievances. (*Id.*)

Plaintiff claims further that on October 7, 2021, Defendant Simon began to tamper with and reject his outgoing legal mail "any time it was being sent to an attorney and had any prison

issues in it." (*Id.*) Plaintiff avers that, on that date, Defendant Simon read a letter addressed to a lawyer that mentioned Plaintiff's treatment at ICF. (*Id.*) Defendant Simon "skimmed the contents" and gave it back to Plaintiff to be sealed. (*Id.*) Later that day, Plaintiff received "his expedited legal mail form and letter back now opened." (*Id.*) The next day, Plaintiff asked Defendant Simon why his legal mail was not sent, and Defendant Simons responded, "f*** you." (*Id.*)

Plaintiff seeks declaratory relief, as well as a preliminary and permanent injunction directing Defendants to transfer him to an "adequate facility for his health issues[,] to lift any restrictions regarding the grievance process[, and] to fix the harmful water system." (ECF No. 1, PageID.14.) He also seeks compensatory and punitive damages. (*Id.*)

**II. Failure to State a Claim**

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court

to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because Section 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under Section 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

**A. First Amendment Claims**

**1. Retaliation**

Plaintiff alleges that his First Amendment rights were violated because he experienced various acts of retaliation after he filed grievances regarding his medical treatment. Specifically, Plaintiff avers that: (1) Defendant Huyge took his personal property because of the grievance he filed; (2) Defendant Burlette threatened to ensure that he would never receive his property and dialysis unless he withdrew his grievance; (3) Defendant Sices refused to transfer him to a facility that would better accommodate his health issues unless he withdrew his grievance; and (4) Defendants Simon and Yahus placed him on modified grievance status and refused to process his grievances.

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to

set forth a First Amendment retaliation claim, a plaintiff must establish three elements: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

An inmate's filing of institutional grievances is constitutionally protected conduct under the first prong of *Thaddeus-X*, for which a prisoner may not be subjected to retaliation. *See Shehee v. Luttrell*, 199 F.3d 295, 300-301 (6th Cir. 1999); *Scott v. Kilchermann*, No. 99-1711, 2000 WL 1434456, at *2 (6th Cir. Sept. 18, 2000)*; accord Noble v. Schmitt*, 87 F.3d 157, 162 (6th Cir. 1996) (in the context of a retaliation claim, an involuntarily committed mental patient, who is "an individual in the custody of the state," has a constitutional right to use the hospital grievance procedure); *see also Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000) (in the context of a retaliation claim, inmate had a First Amendment right to file a nonfrivolous "grievance," i.e., a lawsuit, against prisoner officials).

To establish the second element of a retaliation claim, a prisoner-plaintiff must show adverse action by a prison official sufficient to deter a person of ordinary firmness from exercising his constitutional rights. *Thaddeus-X*, 175 F.3d at 396. The adverseness inquiry is an objective one and does not depend on how a particular plaintiff reacted. The relevant question is whether the defendants' conduct is "*capable* of deterring a person of ordinary firmness"; the plaintiff need not show actual deterrence. *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002) (emphasis in original). Defendant Huyge's taking of Plaintiff's property may be considered adverse action

sufficient to support a retaliation claim. *See id.* at 604 (noting that cases from other circuits have held that confiscating an inmate's legal papers and other property constitutes sufficient injury to support a First Amendment retaliation claim). Moreover, Defendant Burlette's threats to ensure that Plaintiff would never reclaim his property or receive his dialysis treatment unless he withdrew his grievance constitute sufficient adverse action as well. *See Thaddeus-X*, 175 F.3d at 396, 398; *Smith v. Yarrow*, 78 F. App'x 529, 542 (6th Cir. 2003). Likewise, Defendant Sices's decision not to transfer Plaintiff to a facility that could better manage his medical condition constitutes sufficient adverse action. *See O'Brien v. Mich. Dep't of Corr.*, 592 F. App'x 338, 343 (6th Cir. 2014).

With respect to Defendants Simon and Yahus, however, the Sixth Circuit repeatedly has held that placement on modified access does not constitute an adverse action for purposes of a retaliation claim. *See, e.g.*, *Alexander v. Vittitow*, No. 17-1075, 2017 WL 7050641, at *5 (6th Cir. Nov. 9, 2017); *Jackson v. Madery*, 158 F. App'x 656, 660 (6th Cir. 2005) (per curiam), *abrogated on other grounds by Maben v. Thelen*, 887 F.3d 252 (6th Cir. 2018); *Walker v. Mich. Dep't of Corr.*, 128 F. App'x 441, 446 (6th Cir. 2005); *Kennedy v. Tallio*, 20 F. App'x 469, 471 (6th Cir. 2001). Placement on modified access would not deter a person of ordinary firmness from continuing to engage in protected conduct, because modified-access status does not impair the ability to file civil rights actions in federal court. A plaintiff's placement on modified access to the grievance procedure merely enables prison officials to screen grievances prior to filing to determine whether they were grievable, non-frivolous, and non-duplicative. *See Kennedy*, 20 F. App'x at 471 (citing Mich. Dep't of Corr. Policy Directive 03.02.130(II)(PP)). For the same reasons that placement on modified grievance access does not amount to adverse action, an official's rejection of a grievance is not sufficiently adverse to state a retaliation claim. *See, e.g.*,

*Branch v. Houtz*, No. 1:16-cv-77, 2016 WL 737779, at *6 (W.D. Mich. Feb. 25, 2016). Plaintiff, therefore, has failed to state a cognizable First Amendment retaliation claim against Defendants Simon and Yahus.

Finally, to state a First Amendment retaliation claim sufficiently, Plaintiff must allege facts that support an inference that the adverse action was motivated by the protected conduct. With respect to Defendants Sices, Burlette, and Huyge, Plaintiff alleges that the adverse action was linked to the protected conduct temporally and that these Defendants indicated to him that their actions were taken in response to his grievances for the purpose of deterring Plaintiff from the continued pursuit of the grievances. The Court, therefore, concludes that Plaintiff has adequately alleged First Amendment retaliation claims against Defendants Sices, Burlette, and Huyge.

**2. Outgoing Mail**

Plaintiff suggests that Defendant Simon violated his First Amendment rights by tampering with and rejecting his outgoing legal mail to an attorney regarding his treatment at ICF. (ECF No. 1, PageID.11.) "[T]he sender of direct personal correspondence derives from the First and Fourteenth Amendments a protection against unjustified governmental interference with the intended communication." *Procunier v. Martinez*, 416 U.S. 396, 408–09 (1974), *overruled in part*, *Thornburgh v. Abbott*, 490 U.S. 401, 413–14 (1989) (overruled regarding incoming mail). To protect outgoing mail from unjustified interference, the Court concluded that prison officials "must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation," and "the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Id.* at 413.

Moreover, the Sixth Circuit has held that prison regulations governing "legal" mail are subject to a heightened standard than those governing general mail. *See Sallier v. Brooks*, 343

F.3d 868, 873–74 (6th Cir. 2003) (finding that legal mail is entitled to a heightened level of protection to avoid impinging on a prisoner's legal rights, the attorney-client privilege, and the right to access the courts). The ability of a prisoner "to receive materials of a legal nature" related to his legal rights and concerns itself implicates a fundamental right. *Kensu v. Haigh*, 87 F.3d 172, 174 (6th Cir. 1996). Courts have, therefore, extended protections to prisoners' legal mail that do not exist for general mail. However, not all outgoing mail constitutes "legal mail," and "the question of what constitutes 'legal mail' is a question of law." *Sallier*, 343 F.3d at 871. The Michigan Administrative Code defines "legal mail" as correspondence with courts, attorneys, public officials, the office of the legislative corrections ombudsman, MDOC's central office staff, and staff of the institution in which the prisoner is incarcerated. *See* Mich. Admin. Code R. 791.6603(7) (Nov. 15, 2008).

Here, Plaintiff alleges that he wrote a letter to an attorney regarding his treatment at ICF. (ECF No. 1, PageID.11.) According to Plaintiff, Defendant Simon read the letter, and after skimming the contents gave it back to Plaintiff to be sealed. (*Id.*) Plaintiff avers, however, that the next day, October 8, 2021, he received the letter back, opened, along with his expedited legal mail form. (*Id.*) When Plaintiff asked Defendant Simon why his legal mail had not been sent, Defendant Simon responded, "f*** you." (*Id.*)

Plaintiff has sufficiently alleged that he was attempting to send legal mail to an attorney, presumably to try to obtain representation for a lawsuit regarding his treatment at ICF. The Court recognizes that in *Stanley v. Vining*, 602 F.3d 767 (6th Cir. 2010), the Sixth Circuit concluded that an inmate did not state a cognizable First Amendment claim when he alleged that a corrections officer had opened and read his incoming legal mail in his presence. *Id.* at 770. The Sixth Circuit noted that the inmate had "no First Amendment right that prevents a guard from opening his mail

in his presence and reading it with an eye to determining if illegal conduct is afoot." *Id. Stanley*, however, concerned incoming, not outgoing, legal mail. Nonetheless, the Supreme Court in *Martinez* recognized that security concerns applied to outgoing mail as well. Accordingly, Defendant Simon's perusal of Plaintiff's outgoing mail does not appear to have violated Plaintiff's First Amendment mail rights. Based on the allegations in Plaintiff's complaint, however, Simon had no reason founded in "security, order, and rehabilitation" to refuse to send Plaintiff's legal mail. The Court, therefore, concludes that Plaintiff has sufficiently stated a First Amendment claim against Defendant Simon regarding his interference with and rejection of Plaintiff's outgoing legal mail.

**3. Processing of Grievances and Placement on Modified Grievance Status**

Plaintiff also suggests that Defendant Simon's refusal to process his grievances and his placement on modified grievance status by Defendants Simon and Yahus violated his First Amendment rights. (ECF No. 1, PageID.13.) Plaintiff's right to petition government is not violated by Defendant's failure to process or act on his grievances. The First Amendment "right to petition the government does not guarantee a response to the petition or the right to compel government officials to act on or adopt a citizen's views." *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999); *see also Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 285 (1984) (holding the right to petition protects only the right to address government; the government may refuse to listen or respond).

Moreover, Defendants' actions, including placing him on modified grievance status, did not violate Plaintiff's First Amendment rights. "A prisoner's constitutional right to assert grievances typically is not violated when prison officials prohibit only 'one of several ways in which inmates may voice their complaints to, and seek relief, from prison officials' while leaving a formal grievance procedure intact." *Griffin v. Berghuis*, 563 F. App'x 411, 415–16 (6th Cir.

2014) (citing *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 130 n.6 (1977)). Indeed, Plaintiff's ability to seek redress is underscored by his pro se invocation of the judicial process. *See Azeez v. DeRobertis*, 568 F. Supp. 8, 10 (N.D. Ill. 1982).

Further, Plaintiff was not wholly denied access to the grievance process. Placement on modified access does not prohibit an inmate from utilizing the grievance process. *See Walker*, 128 F. App'x at 445–47; *Corsetti v. McGinnis*, 24 F. App'x 238, 241 (6th Cir. 2001). The inmate may still request a grievance form and, if the form is provided, submit grievances to the grievance coordinator, who reviews the grievance to determine whether it complies with institutional rules regarding the filing of grievances. *See* MDOC Policy Directive (PD) 03.02.130 ¶ MM (eff. Mar. 18, 2019). Moreover, if a prisoner submits a grievance obtained from a source other than the Step-I grievance coordinator, the grievance coordinator may reject the grievance, in accordance with ¶ J of the policy. (*Id.* at ¶¶ MM, J(3).) As with any grievance rejection under ¶ J, the prisoner may appeal the rejection to the next step of the grievance process. *Id.* ¶ I.

Finally, although Plaintiff does not expressly invoke the Due Process Clause when complaining about Defendants' interference with his administrative grievance remedies, the Court notes that the Due Process Clause does not protect Plaintiff's right to file a prison grievance. The courts repeatedly have held that there exists no constitutionally protected due process right to an effective prison grievance procedure. *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of Corr.*, 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy*, 30 F. App'x 568, 569–70 (6th Cir. 2002); *Carpenter v. Wilkinson*, No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (collecting cases). Michigan law does not create a liberty interest in the grievance procedure. *See*

*Olim v. Wakinekona*, 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994). Because Plaintiff has no liberty interest in the grievance process, Defendants' conduct did not deprive him of due process.

In light of the foregoing, the Court finds that Plaintiff fails to state a cognizable First Amendment claim against Defendants Simon and Yahus regarding the processing of his grievances and his placement on modified grievance status.

### B. Eighth Amendment Claims

Plaintiff suggests that Defendant Sices violated his Eighth Amendment rights by failing to transfer him to another facility that could more adequately care for his kidney issues. (ECF No. 1, PageID.4, 9–10.) He avers further that Defendants Salinas and Burlette violated his Eighth Amendment rights by leaving him in the cell without medical care after he fell and hit his head while still under the influence of pain medication and sedation following his surgery. (*Id.*, PageID6–7.) Finally, Plaintiff alleges that Defendant Furgerson violated his Eighth Amendment rights on July 21, 2021, by lying and stating that Plaintiff had refused his offsite appointment regarding his kidney failure, thereby preventing Plaintiff from receiving treatment. (*Id.*, PageID.8.)

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v.*

*Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954. "Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347). As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.*

For a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)). The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37. To satisfy the objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* at 836. "[P]rison officials who actually knew of a substantial

risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

As part of the obligation to protect prisoners from substantial risks to their health or safety, the Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104–05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). Deliberate indifference may be manifested by a doctor's failure to respond to the medical needs of a prisoner, or by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Estelle*, 429 U.S. at 104–05.

Although Plaintiff has by no means proven deliberate indifference on the part of Defendants Sices, Burlette, Furgerson, and Salinas, his factual allegations, accepted as true, support the inference that Plaintiff suffered serious medical needs and that these Defendants may have been deliberately indifferent to those needs. Therefore, the Court concludes that Plaintiff has alleged sufficient facts to support Eighth Amendment claims against Defendants Sices, Burlette, Furgerson, and Salinas.

**C. Fourteenth Amendment Claim**

Plaintiff maintains that Defendants violated his Fourteenth Amendment due process rights by failing to provide him an opportunity to contest the deprivation of his personal property. (ECF No. 1, PageID.13.) Plaintiff's claim, however, is barred by the doctrine set forth in *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986). Under *Parratt*, an individual deprived of property by a "random and unauthorized act" of a state employee

cannot maintain a federal due process claim unless the state fails to afford an adequate post-deprivation remedy. If an adequate post-deprivation remedy exists, the deprivation, while real, is not "without due process of law." *Parratt*, 451 U.S. at 537. This doctrine applies to both negligent and intentional deprivations of property, as long as the deprivation was not due pursuant to an established state procedure. *See Hudson v. Palmer*, 468 U.S. 517, 530–36 (1984). Plaintiff must plead and prove the inadequacy of state post-deprivation remedies. *See Copeland v. Machulis*, 57 F.3d 476, 479–80 (6th Cir. 1995); *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993). The Sixth Circuit has noted that a prisoner's failure to sustain this burden requires dismissal of his Section 1983 due process action. *See Brooks v. Dutton*, 751 F.2d 197 (6th Cir. 1985).

Upon review of the complaint, the Court concludes that Plaintiff has not sustained his burden in this matter because he has not alleged that state post-deprivation remedies are inadequate. Moreover, Plaintiff has available to him numerous state post-deprivation remedies. First, a prisoner who incurs a loss through no fault of his own may petition the institution's Prisoner Benefit Fund for compensation. MDOC Policy Directive 04.07.112, ¶ b (eff. Dec. 12, 2013). Moreover, aggrieved prisoners may submit claims for property loss of less than $1,000.00 to the State Administrative Board. Mich. Comp. Laws. § 600.6419; MDOC Policy Directive 03.02.131 (eff. Oct. 21, 2013). Finally, Michigan law authorized actions in the Court of Claims asserting tort or contract claims "against the state or any of its departments or officers." Mich. Comp. Laws § 600.6419(1)(a) (eff. Nov. 12, 2013). The Sixth Circuit has specifically held that Michigan provides adequate post-deprivation remedies for deprivation of property. *See Copeland*, 57 F.3d at 480. Plaintiff alleges no reason why a state-court action would not afford him complete relief for the deprivation, either negligent or intentional, of his personal property. Plaintiff's due process claims regarding his property will, therefore, will be dismissed.

**Conclusion**

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendant Yahus will be dismissed for failure to state a claim, under 28 U.S.C. § 1915A(b), and 42 U.S.C. § 1997e(c). The Court will also dismiss, for failure to state a claim, the following claims: (1) Plaintiff's First Amendment retaliation claim against Defendant Simon; (2) Plaintiff's First Amendment claim regarding the processing of grievances and placement on modified grievance status against Defendant Simon; and (3) Plaintiff's Fourteenth Amendment due process claim concerning the deprivation of his property. The following claims remain in the case: (1) Plaintiff's First Amendment retaliation claims against Defendants Sices, Burlette, and Huyge; (2) his First Amendment mail claim against Defendant Simon; and (3) his Eighth Amendment claims against Defendants Sices, Burlette, Furgerson, and Salinas.

An order consistent with this opinion will be entered.

Dated: January 31, 2022

/s/ Sally J. Berens
SALLY J. BERENS
U.S. Magistrate Judge